# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40413**

————————————

**UNITED STATES**
*Appellee*

**v.**

**James P. BAUMGARTNER**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 18 February 2025

————————————

*Military Judge*: Mark F. Rosenow.

*Sentence*: Sentence adjudged 29 September 2022 by GCM convened at Schriever Space Force Base, Colorado. Sentence entered by military judge on 4 November 2022: Dishonorable discharge, confinement for 3 years, reduction to E-1, and a reprimand.

*For Appellant*: Major Kasey W. Hawkins, USAF; Captain Samantha M. Castanien, USAF; Frank J. Spinner, Esquire.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

WARREN, Judge:

A general court-martial composed of officer members found Appellant guilty, contrary to his pleas, of two specifications of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b, and three specifications of assault consummated by a battery upon a child under the age of 16 in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1] All allegations against Appellant pertained to his treatment of AB, his teenage daughter.

While Appellant was convicted of all five specifications at trial (Specifications 1 and 2 of Charge I, and Specifications 1–3 of Charge II), after findings, the specification alleging battery of AB by holding her hands while lifting her shirt (Specification 1 of Charge II) was conditionally dismissed. This conditional dismissal was predicated upon the specification of child sexual abuse of AB via a lewd act involving touching her breast (Specification 1 of Charge I) "surviving the completion of appellate review." In addition, after findings, two remaining specifications of battery upon a child under the age of 16 in violation of Article 128, UCMJ (Specifications 2 and 3 of Charge II), were consolidated into a single specification stating: "In that [Appellant] . . . did, at or near Santa Maria, California, on or about 27 August 2017, unlawfully grab by the neck with his hand and unlawfully strike on her face with his hand, [AB], a child under the age of 16 years."

The court-martial sentenced Appellant to a dishonorable discharge, confinement for three years, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings and approved the sentence in its entirety.

Appellant raises six issues on appeal, which we reordered: (1) whether the convening authority impermissibly considered the race and gender of potential court members when detailing members to the court-martial; (2) whether the findings of guilty as to sexual abuse of a child related to the touching of the child's breasts are legally and factually insufficient; (3) whether the findings of guilty as to sexual abuse of a child related to the touching of the child's vulva are legally and factually insufficient; (4) whether the findings of guilty as to assault consummated by a battery upon a child under the age of 16 years for grabbing the child by the neck are legally and factually insufficient; (5) whether the findings of guilty as to assault consummated by a battery upon a

---

[1] Unless otherwise indicated, all references to the punitive articles are to the *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*). All other references to the UCMJ, Rules for Courts-Martial and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).

child under the age of 16 years for slapping the child across the face are legally and factually insufficient in light of the parental discipline defense; and (6) whether trial defense counsel were ineffective in their redirect examination of a defense witness, Technical Sergeant (TSgt) JG. In addition, although not raised as an assignment of error, we consider an additional issue: (7) whether Appellant is entitled to relief for unreasonable appellate delay.

We have carefully considered the assignments of error and find no error that materially prejudiced Appellant's substantial rights. *See* Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, we affirm the findings and sentence. *See* Article 59(b), UCMJ, 10 U.S.C. § 859(b).

## I. BACKGROUND

The court-martial convicted Appellant of three discrete categories of misconduct against his biological daughter, AB, set forth in five charged specifications, including: (1) committing a lewd act against AB by directly touching her breasts with his hand with an intent to abuse her between on or about January 2014 and on or about January 2018; (2) committing a lewd act against AB by touching her vulva with his foot with an intent to abuse her on divers occasions between on or about January 2015 and January 2018; and (3) battery against AB by grabbing her neck with his hand and slapping her face with his hand on or about 27 August 2017.

Additional background pertinent to Appellant's specific assignments of error is included within the discussion of each of those respective issues below.

## II. DISCUSSION

### A. Court Member Selection

#### 1. Additional Background

Two different convening orders pertain to this case. The first, Special Order A-7 dated 21 January 2022, issued prior to arraignment, listed 15 officer and 6 enlisted members. The second, Special Order A-14, dated 23 September 2022, issued prior to voir dire, contained all officer members. Appellant submitted a notice of intended pleas and forum in the interval between the two convening orders indicating he intended to be tried by a panel of officer members. Included with the record of trial are the lists of potential court-martial members that were provided to the convening authority for consideration and selection pertaining to each order. These documents included each individual's name, rank, unit of assignment, duty title, whether the individual has prior experience serving on a court-martial or administrative board, and, in the case of officers, whether they have experience as commanders. Neither the gender nor the race of the individuals was expressly indicated on these documents. The

convening authority indicated the members he selected to serve on the court-martial by writing his initials next to the individuals' name.

Appellant did not object to the convening authority's court member selection process prior to his appeal before this court.

On appeal, Appellant moved to attach panel member data sheets (styled "Space Operations Command Court Member Questionnaire") containing personal data regarding the prospective court members which had been provided to the convening authority as part of the selection process. These documents contained considerably more personal and career information about each individual, including an indication of their gender and race. The Government objected to the attachment of these documents on the grounds that these documents were outside the "entire record" this court may consider in our review pursuant to Article 66, UCMJ, 10 U.S.C. § 866, and not "necessary to resolve an issue raised by the record," citing *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020). This court granted the motion to attach but deferred its consideration of the applicability of *Jessie* until it conducts its Article 66, UCMJ, review. We now consider the attached members' documents.

Upon review of the attachments we note, of the 15 officers selected in the first convening order, based upon the ordinary gender alignments of their names, 10 were men and 5 were women. In approving the second convening order, the convening authority excused all 6 enlisted members and 10 officer members from the first convening order, including 10 men and 6 women, and replaced them with 11 officer members. Of those replacement members 3 were female and 8 were male. One of the replacement female officers was also African American. Of the 29 member data sheets submitted to the convening authority for review in promulgating the second convening order, 9 were for female officers. In excusing officer members and selecting new ones in conjunction with the second convening order, the convening authority excused officers in the grades of O-2 to O-6 and replaced them with officers within the grades of O-3 to O-5.

### 2. Law

Court-martial composition issues not raised at trial are forfeited and reviewed on appeal for plain error. *United States v. King*, 83 M.J. 115, 120–21 (C.A.A.F. 2023), *cert. denied*, 144 S. Ct. 190 (2023). Under the plain error standard of review, the "[a]ppellant bears the burden of establishing: (1) there is error; (2) the error is clear or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Robinson*, 77 M.J. 294, 299 (C.A.A.F. 2018) (citation omitted). In undertaking a plain error analysis, we "consider whether the error is obvious at the time of appeal, not whether it was obvious

at the time of the court-martial." *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008).

"When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(e)(2), UCMJ, 10 U.S.C. § 825(e)(2).

In *United States v. Crawford*, our superior court's predecessor, the United States Court of Military Appeals, held that the intentional selection of African American servicemembers to serve on courts-martial in order to ensure fair representation of the community was consistent with constitutional guarantees of equal protection. 35 C.M.R. 3, 13 (C.M.A. 1964); *see also United States v. Smith*, 27 M.J. 242, 249 (C.M.A. 1988) ("[A] commander is free to require representativeness in his court-martial panels and to insist that no important segment of the military community—such as blacks, Hispanics, or women—be excluded from service on court-martial panels.").

In *Batson v. Kentucky*, the United States Supreme Court held a criminal defendant "ha[s] the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria," and in particular "the Equal Protection Clause[2] forbids the prosecutor to challenge potential jurors solely on account of their race" through the exercise of peremptory challenges. 476 U.S. 79, 85–86, 89 (1986) (citation omitted). Following *Batson*, in *J.E.B. v. Ala. ex rel. T.B.*, the Supreme Court held that "gender—like race—is an unconstitutional proxy for juror competence and impartiality." 511 U.S. 127, 128 (1994)*; see also United States v. Patterson*, No. ACM 40426, 2024 CCA LEXIS 399, at *20–21 (A.F. Ct. Crim. App. 27 Sep. 2024) (unpub. op.) (holding that "*J.E.B.* essentially put gender on the same constitutional footing as race"), *rev. granted on different grounds*, No. 25-0073/AF, __ M.J. __, 2025 CAAF LEXIS 16, *1 (C.A.A.F. 6 Jan. 2025).

In *United States v. Jeter*, the United States Court of Appeals for the Armed Forces (CAAF) overruled *Crawford* in light of *Batson*, holding that "[i]t is impermissible to exclude or intentionally include prospective members based on their race." 84 M.J. 68, 73 (C.A.A.F. 2023). As the CAAF explained, "whenever an accused makes a prima facie showing that race played a role in the panel selection process at his court-martial, a presumption will arise that the panel was not properly constituted," which the Government may then attempt to rebut. *Id*. at 70. In *Jeter*, "trial defense counsel challenged the makeup of the panel, citing a 'systematic exclusion of members based on race and gender.' The

---

[2] U.S. CONST. amend. XIV.

military judge noted that '[i]t appears that [the panel] is all white men' . . . ." *Id.* at 71 (alterations in original). On appeal, the CAAF found the appellant had made a "prima facie showing that gives rise to a presumption that race was allowed to enter the selection process." *Id.* at 74. In support of this conclusion, the CAAF cited "racial identifiers" that were included in court member questionnaires provided to the convening authority, as well as "other evidence before the [C]ourt of [C]riminal [A]ppeals [(CCA)]," and "the command's understandable belief that the *Crawford* case . . . was still good law." *Id.* Among this other evidence before the CCA was information that "two African American members on the original convening order were subsequently removed pursuant to the first amendment to the convening order; and three other courts-martial with African American accuseds were convened by this convening authority before all-white panel members." *Id.* In addition, the CCA obtained declarations from the convening authority and staff judge advocate, but "for all intents and purposes those affidavits simply reflected that they could not recall how the venire panel was chosen." *Id.* Under these circumstances, the CAAF found an "unrebutted inference that Appellant's constitutional right to equal protection under the law was violated when the acting convening authority presumptively used a race-conscious selection process for panel members." *Id.*

### 3. Analysis

Relying on *Jeter*, Appellant contends his court-martial panel was improperly constituted because the convening authority inappropriately considered race and gender in selecting members. Appellant cites the fact that, as in *Jeter*, racial and gender identifiers for prospective court members were provided to the convening authority. He also notes *Jeter* had not yet been decided, and, at the time, applicable precedent did not prohibit the consideration of race or gender in order to ensure a court-martial panel that was representative of the military community. Appellant additionally cites "one for one" replacement of three female panel members (one of whom was also an African American panel member) between the first and second convening order as prima facie evidence that the convening authority impermissibly considered race and gender in selecting those members.

In response, the Government first contends Appellant's argument cannot succeed because it relies on the court member data sheets attached on appeal which were not part of the "entire record" originally docketed with the court, and are not necessary to resolve an issue raised by the record but "not fully resolvable by the materials in the record." *See Jessie*, 79 M.J. at 442. The Government notes *Jeter* did "not address whether gender was an appropriate consideration in member selection;" and even if the same prohibition applies to gender as to race, the Government denies the selection of 3 females from a list that included 9 females and 20 males establishes a prima facie claim of gender

discrimination. Pointedly, the Government contends that the raw statistical probability of the convening authority selecting females for the second convening order venire was 31% (9 of 29 questionnaires)—asserting "if the convening order blindly picked 10 officers, he was likely to select [3] female officers."

Because Appellant did not object to the convening authority's selection of court members at trial, we review for plain error. *See King*, 83 M.J. at 120–21. For the reasons stated below, we conclude Appellant has failed to demonstrate plain error.

As an initial matter, although the Government is correct that *Jeter* specifically addressed racial discrimination, as we recently explained in *Patterson*, we assume for purposes of our analysis the same rationale applies to the selection or exclusion of members based on gender. *See Patterson*, unpub. op. at *20–21.

Next, we will assume, for purposes of our analysis, *Jessie* does not bar our consideration of the member data sheets and SURFs Appellant moved to attach on appeal. We note that the names of the members the convening authority did and did not select *are* included in the record, and these names are some indication of the proportions of males and females selected. In particular, the "one for one" replacement of female panel members (one of whom was also an African American panel member) may be sufficient to raise, but not resolve, an issue as to whether the convening authority improperly considered gender and race in appointing court members. Accordingly, *Jessie* would permit us to consider the data sheets and SURFs in order to resolve this issue. 79 M.J. at 442; *Patterson*, unpub. op. at *21.

Nevertheless, we are not persuaded Appellant has met his burden to demonstrate "clear" or "obvious" error in the selection process. We agree with the Government that the routine provision to the convening authority of professional and personal information including race and gender does not in itself constitute a prima facie showing that the convening authority improperly relied on such criteria in selecting members under the plain error standard of review. "[R]acial identifiers are neutral, [although] capable of being used for proper as well as improper reasons." *Jeter*, 84 M.J. at 74 (citing *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994)). "We will not presume improper motives from inclusion of racial and gender identifiers on lists of nominees for court-martial duty." *Loving*, 41 M.J. at 285.[3] Similarly, we are not persuaded the selection on one occasion of 3 females and 7 males from a pool of 9 female and 20 male prospective replacement members meets the "clear" or "obvious"

---

[3] We note *Jeter* did not purport to overrule *Loving*, which *Jeter* cited with evident approval. *See Jeter,* 84 M.J. at 74.

standard where (1) an innocent explanation is facially plausible, and (2) Appellant has not identified a similar pattern of possible discrimination in any other court-martial involving this convening authority.

The circumstances in *Jeter* are distinguishable in several significant ways. First, and importantly, the appellant in *Jeter* did not forfeit the issue but challenged the selection process at trial, alleging "systematic exclusion of members based on race and gender." 84 M.J. at 71. Moreover, the record in *Jeter* indicated the panel was composed entirely of "white men." *Id*. Two African American members on the original convening order were subsequently removed from the panel by the convening authority. *Id*. at 74. Furthermore, the convening authority at issue in *Jeter* had a documented history of race-conscious selections, having convened all white court-martial panels for three prior courts-martial involving African American accuseds. *Id*. The CAAF concluded these circumstances, coupled with the provision of racially identifying information to the convening authority, were sufficient for a prima facie showing under ordinary standards of review. In Appellant's case, we do not have comparable circumstances. Instead, we have a situation where statistically, the raw likelihood of selecting female panel members aligned nearly precisely with the actual panel venire selections by the convening authority. Appellant's burden to demonstrate "clear" or "obvious" error requires something more substantial than that. Thus, we find Appellant has not demonstrated the purposeful misuse of race or gender as a selection criterion by the convening authority under these circumstances. We find no clear error and conclude that Appellant is not entitled to relief on this issue.

## B. Legal and Factual Sufficiency

### 1. Additional Background

The primary evidence for Appellant's convictions for two specifications of sexual abuse of a child between January 2014 and January 2018 in violation of Article 120b, UCMJ, came from AB's testimony. Trial defense counsel sought to impeach her credibility at several points during her cross-examination concerning previous occasions where she admitted lying to her parents, school officials, and law enforcement about unrelated events. However, as to the actual charged misconduct in this case, AB's testimony was corroborated by Appellant's oral admissions in March 2022 during a pretext phone call with AB, and by his written admissions over direct message communications with AB from February through June 2020. The primary evidence for Appellant's convictions for assault consummated by a battery upon a child under the age of 16 years on 27 August 2017 in violation of Article 128, UCMJ, came from AB's testimony; a prior audio-recorded interview by civilian law enforcement of EB, AB's

brother,[4] who witnessed the incident; and photographic evidence of red marks on AB's face and neck as observed by witnesses and civilian law enforcement who responded to the scene. Detailed discussion of surrounding circumstances for these offenses follows.

### a. Child Sexual Abuse via Lewd Acts (Sexual Contacts)

In January 2014, when the events giving rise to allegations of sexual abuse against her by Appellant began, AB was approximately 11 years old. Appellant divorced AB's mother when AB was 2 or 3 years old, and by 2014, AB was primarily living with Appellant (AB's father) and his new wife, TSgt JG.

### i) Breast touching and the "flash the world" game

The sexual abuse of AB began with the "flash the world" game when she was in the fifth grade. AB was approximately 11 years old and living with Appellant while he was stationed in Colorado.[5] As part of that "game" Appellant would lock AB's arms behind her back so she could not move, and then lift up her wired bra and shirt, while in the process making contact with her breasts with his hands. After she was exposed, he walked her towards a window. AB testified that when these "games" began, she considered them "funny" and did not view them as punishment, and that both she and Appellant would laugh during them.

However, things changed as she grew older and continued to develop physically during puberty. Over time, AB would tell Appellant to stop and try to pull her shirt down when he tried to pull it up. The family moved to California in the summer of 2017 when Appellant completed a permanent change of station move (PCS) to Vandenberg Space Force Base (SFB), California. Once in California, and just prior to her freshman year of high school, AB told Appellant that the "flash the world" game made her feel uncomfortable, and they both agreed she was "too old" to be subjected to it. Nonetheless, after this mutual agreement that AB was too old to have her father exposing her breasts as a "game," Appellant persisted in that activity approximately 20 to 30 times before AB ceased living with Appellant altogether in November 2017. On the last occasion of this "flash the world game," Appellant was alone with AB in the house when he tried to initiate playful wrestling with AB. After she

---

[4] This interview was admitted at trial as a "past recollection recorded" pursuant to Mil. R. Evid. 803(5) after EB testified to no longer having a precise memory of those events.

[5] The same facts supporting Appellant's conviction for sexual abuse of AB by touching AB's breast with his hand with the intent to abuse her also apply to Appellant's conviction for the conditionally dismissed battery specification which involved "unlawfully hold[ing] the arms of [AB], a child under the age of 16 years, with his hands while lifting her shirt."

unequivocally told him "no" and to "leave [her] alone," he locked her arms behind her back, pulled her bra and shirt up over her head, and said, "This is what you want the world to see." Meanwhile, AB was screaming at him, telling him to "get off of [her]." She felt mad at Appellant and humiliated by the incident. During her testimony, AB explained that she felt "like [she] didn't want to be in [her] body anymore."

### ii) Vulva touching and the "I toe'd you so" game

Appellant's touching of AB's vulva with his foot also occurred during what was originally conveyed by Appellant to AB as another game—this time the "I toe'd you so" game. This "game" began when AB was approximately 13 years old and was once again preceded by purportedly playful wrestling. Appellant would grab AB's arms and pull them toward him while he and she were on the couch, and then place his toe on her vaginal area and press it into her vulva (over her clothes). As he pressed his toe into AB's vulva, he would chuckle and say, "I toe'd you so." During these encounters AB would try to get away from Appellant. She would tell him to "stop," cry, or yell. AB testified that these encounters left her feeling "hurt," "sore," and "embarrassed."

As with the "flash the world" game, AB told Appellant that she was "too old" for the "I toe'd you so" game, raising the issue during the same discussion she had with Appellant regarding the "flash the world game" just prior to her freshman year in high school. Nonetheless, Appellant persisted with this "game" during the 2015 to 2017 timeframe on multiple occasions.

AB's younger brother, EB, testified at trial that during the charged timeframe he would play "foot wars" with his sister where they would playfully kick each other, and he would do the same with his father, but separately from AB. EB did not recall any occasion where Appellant subjected EB to the "I toe'd you so" game.

### iii) Appellant's admissions

At trial the Government admitted a series of social media direct message communications between Appellant and AB (Prosecution Exhibit 1) in which he appears to admit to and show remorse for the "games" referenced above:

> [Appellant:] Flash the world, and I towed you was so wrong of me . . .
>
> [AB:] Thank you it means a lot coming from you
>
> [Appellant:] I don't know what I was thinking
>
> But it wasn't wrignt [sic]
>
> Right!!!
>
> I hope you can forgive me for that.

In addition, the Government admitted an audio recording of a pretext phone call (Prosecution Exhibit 3) between Appellant and AB conducted on 22 March 2021 under the supervision of the Air Force Office of Special Investigations (OSI) while investigation into these charges was ongoing. The Government played the audio recording at trial before the members. During the call, AB asked Appellant to explain to her "why things happened the way they did," which led to the following exchange:

[AB:] Like the flashing the world and the toes, flashing the world and.

[Appellant:] Yep, those were games that got way out of control.

[AB:] Those weren't games. I told you how that made me uncomfortable and you didn't even care.

[Appellant:] It's not that I didn't care.

[AB:] Well, what was it? When I'm telling you that what you're doing is making me uncomfortable and you just went ahead—

[Appellant:] I don't have any answers for you. I'm sorry.

[AB:] You don't even sound sorry.

[Appellant:] How does sorry sound?

[AB:] Genuine. Like you care a little bit. That—I don't know, a lot of things that you did literally broke your own daughter and you just don't seem to care and carry on with life like nothing ever happened.

[Appellant:] I'm sure that that's your perspective.

[AB:] No, that's not a perspective. It [sic] why did my breasts have to be shown? What did I do to deserve that? Like outside of the window and why—why the toes? That made—it hurt. My vagina hurt. And not even that, that made me uncomfortable to sit there after that happened all the time. And to think like what the hell is even going on. All you can sit there and say is you don't have any answers. There is no answers to why?

[Appellant:] Yes, that is correct. Unfortunately, that is what happened.

### b. Assaults Consummated by a Battery Against a Child Under the Age of 16

Appellant was the primary disciplinarian for AB while she was living with him. He would routinely use a paddle he made for the specific purpose of spanking AB and stored it under her bed as a reminder to her of how he would punish

her for perceived misconduct. At trial, AB also testified that there were several occasions when Appellant would "body slam" her if she tried to run from him as he was trying to inflict corporal punishment on her. That evidence was admitted without objection at trial.

The incident giving rise to allegations that Appellant grabbed AB's neck and slapped her face in August 2017 occurred during Appellant's permanent change of station travel to Vandenberg SFB. AB, then approximately 14 years old, and her brother EB, then approximately 12 years old, were staying in the same off-base hotel room with Appellant and his new wife, TSgt JG. On the evening of the incident, tempers were strained because Appellant and TSgt JG were arguing in their room. AB and Appellant then got into an argument after TSgt JG took AB to task for using TSgt JG's boxing glove tape to fashion a makeshift dog leash to take the family dogs for a walk. AB was upset at the argument she had with TSgt JG and went to complain to Appellant about it. When AB tried to talk to Appellant about the situation, AB and Appellant got into a loud "yelling" argument that quickly escalated to physical violence. In her testimony at trial, AB explained during direct examination that:

> [AB:] . . . [Appellant] slapped his hand over my mouth and my nose and pushed me to the wall in a chokehold. And then I was screaming, so then he put his hand over my mouth again and pushed me to the ground. . . . And then my dad—I get up and we're still fighting. And all of a sudden, he had his arm around my throat and his hands were in my mouth and my nose and he was like, swinging me around, choking me.
>
> [Trial Counsel (TC):] When you say "choking you" . . . was his hand on your neck?
>
> [AB:] He had me in a head lock.
>
> [TC:] Headlock. What was going through your mind when he had you in that headlock?
>
> [AB:] My dad hit me, but he never did that to me before. . . . So when he did that, it just—I felt the anger. I felt it inside of him. Just going from when I was younger, he was my best friend. I loved my dad. So, just looking when he was first choking me, looking into his eyes, and I—how could [he] look me in the eyes while [he's] doing that.

During redirect examination, AB reaffirmed her perceptions of Appellant's motives in grabbing her neck and slapping her face, asserting that Appellant, fueled by alcohol, had "fire in his eyes," and "It just didn't even look like my dad anymore. And I could just feel when he grabbed me that he wasn't even there."

Contrary to TSgt JG's testimony, who testified she did not recall hearing any commotion after arguing with AB, EB, AB's younger brother, did recall these events. EB's prior statement was audio recorded by law enforcement in November 2017 during Santa Maria Police Department's investigation of AB's sexual abuse allegations against Appellant and was admitted as a past recollection recorded at trial. In his audio-recorded statement, EB corroborated AB's version of events, stating:

> [H]e put his hand around her mouth . . . like in her mouth, and . . . he put his arm . . . around her neck and like lifted her up and like starting swinging her around . . . . My dad came out and started, like, manhandling her.

### c. Civilian and Military Law Enforcement Investigations

Civilian law enforcement in Santa Maria, California, opened two separate investigations into Appellant for the incidents described above. The first investigation was opened on 27 August 2017 when local civilian law enforcement responded to the Santa Maria Inn after a group of women celebrating a bachelorette party saw AB wandering the halls crying, with a bleeding lower lip and red marks around her neck. These women calmed AB, asked her what happened, took pictures of her face and neck injuries, and then called the police to report the incident. Responding to the scene, law enforcement interviewed AB, EB, Appellant, and TSgt JG, and reviewed the photos of her injuries.

The second Santa Maria investigation was opened on 17 November 2017 when AB reported her sexual abuse allegations against Appellant. On the same day of the final "flash the world" incident, AB reported the incident to her mother and uncle. While AB's mother did not call the police, AB's uncle did. His call precipitated the second Santa Maria investigation and a third in Vail, Colorado, where AB's uncle lived. Following this report to law enforcement, AB moved out of Appellant's house and moved in with her uncle and then with her boyfriend in Colorado.

For reasons unspecified at trial, both of those civilian investigations remained open but were only discovered by the Air Force authorities in February 2021 during a routine security clearance background investigation of Appellant. Thereafter, members of the OSI reached out to AB and it was then that she reported the physical and sexual abuse recounted above to OSI. As part of the OSI investigation, AB initiated a pretext phone call with Appellant on 22 March 2022. During this phone call, Appellant made the oral admissions regarding "flash the world" and "I toe'd you so" noted *supra*.

Throughout these investigations, AB never returned to live with Appellant. However, she remained in periodic contact with Appellant, and would occasionally ask him for financial support. Her last request for financial support to

her father came on or about 20 March 2022, two days prior to the OSI pretext phone call with Appellant but following her prior allegations against her father as recounted *supra*.

### d. Instructions and Findings

Appellant requested and the military judge instructed the court-martial members on the parental discipline defense during the findings instructions at trial. Similarly, the military judge provided a Mil. R. Evid. 404(b) type limiting instruction vis-a-vis the uncharged incidents AB referred to during her testimony.[6] The military judge instructed the court members that they may consider those incidents for two limited purposes: (1) for their tendency, if any, to explain AB's decision to report the charged offenses against Appellant, or (2) to rebut or reinforce any charge that AB recently fabricated her allegations or testified from a recent improper influence or motive.

During findings deliberations, the court members asked if there was a legal definition for the word "abuse" pertinent to the two specifications alleging violations of Article 120b(3), UCMJ, sexual abuse of a child via lewd acts with the intent to abuse. In response, the trial defense counsel requested that the military judge instruct the court members "that there's no definition and to use your common knowledge." Ultimately, the military judge instructed the court members as trial defense counsel had requested, telling the court members that "the term 'abuse' is not further defined under Article 120b, Uniform Code of Military Justice. For that reason, you are instructed to give the term its common ordinary and accepted meaning."

The court-martial members found Appellant guilty of all charges and specifications without any exceptions or substitutions.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

For evaluating convicted offenses committed before January 2021, "[t]he test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

---

[6] During her direct examination, AB testified to two instances of uncharged misconduct by Appellant: (1) that Appellant directed her to model underwear, and (2) that Appellant sexually assaulted AB's biological mother. The Defense did not object to any of that testimony.

essential elements of the crime beyond a reasonable doubt." *Robinson*, 77 M.J. at 297–98 (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (alterations in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### a. Article 120b, UCMJ: Child Sexual Abuse via Lewd Acts (Specifications 1 and 2 of Charge I)

In order to convict Appellant of sexual abuse of a child via sexual contact, the Government was required to prove that on divers occasions between on or about 1 January 2014 and on or about 1 January 2018, within the continental United States, Appellant touched AB's vulva with his foot with an intent to abuse her. *See* Article 120b(c), UCMJ, 10 U.S.C. § 920b(c); *see also Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45b.b.(4)(a). To convict Appellant of the second specification of the same charge, the Government was required to prove the same elements, on divers occasions, except between on or about 1 January 2015 and on or about 1 January 2018, and that the applicable sexual contact was Appellant touching AB's breast with his hands with an intent to abuse her. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(4)(a).

A "lewd act" includes any sexual contact with a child. Article 120b(h)(5)(A), UCMJ, 10 U.S.C. § 920b(h)(5)(A). For purposes of Article 120b, UCMJ, "sexual contact" includes "touching . . . either directly or through the clothing, the genitalia . . . [or] breast . . . of any person, with an intent to abuse, humiliate, or degrade any person." Article 120(g)(2), UCMJ, 10 U.S.C. § 920(g)(2); Article 120b(h)(1), UCMJ, 10 U.S.C. § 920b(h)(1) (adopting the definition of "sexual contact" from Article 120(g), UCMJ). The term "abuse" is not defined in the statute.

Article 120b(c), UCMJ, lewd acts against a child involving sexual contact, is a specific intent offense. *See* 2016 *MCM*, Pt. IV, ¶45b.b.(4)(a)(ii). Specific intent may be proved by circumstantial evidence. *See United States v. Rodriguez*, 79 M.J. 1, 4 (C.A.A.F. 2019) (citing *United States v. Acevedo,* 77 M.J. 185, 189 (C.A.A.F. 2018) ("Intent can be shown by circumstantial evidence."); *United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) ("[T]he Government was free to prove Appellant's intent by circumstantial evidence." (Alteration in original)) (holding in an Article 120b(c), UCMJ, case that circumstantial evidence was competent to prove appellant's intent to gratify sexual desire); *see also Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962) ("The conduct of the parties within a reasonable time before and after [an act] are circumstances which a jury may consider in determining such intent, motive or purpose."). Relatedly, a finder of fact at trial is authorized to infer that a person intends the natural and probable consequences of their actions. *See, e.g., United States v. Willis*, 46 M.J. 258, 261 (C.A.A.F. 1997) ("[W]e infer the intent when the result was the same as that intended or at least a natural and probable consequence of the intended result . . . . [If] the defendant has the requisite intent for the intended crime, the defendant will be responsible for the natural and probable consequences of the act.").

The parties in this case debate the meaning of "abuse" as referenced in Article 120c, UCMJ. We consider issues of statutory interpretation de novo. *United States v. Mendoza*, __ M.J. __, No. 23-0210, 2024 CAAF LEXIS 590, at *8 (C.A.A.F. 7 Oct. 2024) (citation omitted). "In the absence of a statutory definition, the plain language of a statute will control unless it is ambiguous or leads to an absurd result." *United States v. Cabuhat*, 83 M.J. 755, 765 (A.F. Ct. Crim. App. 2023) (en banc) (citation omitted). In turn, plain and ordinary meaning can be gleaned from dictionary definitions of terms. *Id.* at 766 (quoting *United States v. Schmidt*, 82 M.J. 68, 75–76 (C.A.A.F. 2022) (Ohlson, C.J., concurring in the judgment) (footnote and citation omitted) ("[W]hen a word has an easily graspable definition outside of a legal context, authoritative lay dictionaries may also be consulted.")); *see id.* at 767 n.12 (consulting *Oxford English Dictionary* and *Merriam Webster's Dictionary* for common and ordinary usage of the word "presence").

When we see a facial ambiguity in a statutorily undefined term, we must interpret that term in the broader context of the entire statute. *See United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017) (reasoning that words and phrases within the UCMJ are interpreted by examining, *inter alia*, "the context in which the language is used, and the broader statutory context" (quoting *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016)). Relatedly, "unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense." *United States v. Edwards*, 46 M.J. 41, 43 (C.A.A.F. 1997) (citation

omitted). Finally, we are mindful of the surplusage canon of construction by which "if possible, every word and every provision is to be given effect and [ ] no word should be ignored or needlessly be given an interpretation that causes it to duplicate another provision or to have no consequences." *Mendoza*, 2024 CAAF LEXIS 590, at \*12 (quoting *Sager*, 76 M.J. at 161).

### b. Article 128, UCMJ: Assaults Consummated by a Battery Against a Child Under the Age of 16 (Specifications 2 and 3 of Charge II)

In order to convict Appellant of assault consummated by a battery against a person under the age of 16 years, the Government had to prove the following elements: (1) that Appellant did bodily harm to AB (to wit: grabbing her neck with his hand); (2) that he did so with unlawful force or violence; and (3) that at the time AB was under the age of 16 years. 2016 *MCM*, Pt. IV, ¶54.b.(3)(c). To convict Appellant of the second specification of the same charge, the Government was required to prove the same elements over the same time period, except that the applicable bodily harm to AB was to wit: striking her face with his hand. *See* 2016 *MCM*, pt. IV, ¶ 54.b.(3)(c).

Parental discipline is an established defense to such allegations, but to apply, Appellant's purpose in inflicting corporal punishment on the child "must be for the *primary purpose of safeguarding or promoting the welfare of the child,* including the prevention or punishment of the child's misconduct." *Military Judge's Benchbook*, Dept. of the Army Pamphlet 27-9 at 1712 (29 Feb. 2020) (emphasis added). Furthermore, "the force used may not be unreasonable or excessive." *Id.*; *see also United States v. Rivera*, 54 M.J. 489, 492 (C.A.A.F. 2004) (footnote omitted) (holding that the Government can meet its burden of establishing a substantial risk of serious bodily injury without "physical manifestation of actual harm").

### 3. Analysis

#### a. Sexual Abuse of a Child, AB, via Lewd Acts

Much of the controversy in this case centers around the definition of "abuse." Appellant contends his convictions for child sexual abuse against AB are legally and factually insufficient because Appellant did not have the specific intent to "abuse" AB when he touched her breast with his hands and her vulva with his foot. Appellant argues that "abuse" connotes only physical injury and asserts that "[w]hatever 'intent to abuse' means, it has to be distinct from 'intent to degrade' and distinct from 'intent to humiliate.'" Meanwhile, the Government counters that "abuse" is more expansive than solely intent to cause physical injury and instead includes "cruel treatment," whether or not undertaken with an intent to inflict physical injury. The Government cites to *Black's Law Dictionary* which defines "abuse" as follows:

17

> Abuse, 1. To damage (a thing). 2. To depart from legal or reasonable use in dealing with (a person or thing); to misuse. 3. To injure (a person) physically or mentally. 4. In the context of child welfare, to hurt or injure (a child) by maltreatment. In most states, a finding of abuse is generally limited to maltreatment that causes or threatens to cause lasting harm to the child.

*Abuse*, BLACK'S LAW DICTIONARY 5 (11th ed. 2019).[7]

In construing the definition of "abuse" we are mindful of our superior court's holding in *Sager*; that serial terms designated in Article 120(b)(4) of "asleep," "unconscious," "or otherwise unaware" created distinct categories of liability and not merely methodologies of committing the same type of act. 76 M.J. at 161–62 ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless context dictates otherwise." (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))). Our superior court recently reaffirmed that reasoning in *Mendoza*, explaining that *Sager*'s holding was premised upon an application of the surplusage canon of statutory construction. 2024 CAAF LEXIS 590, at \*12. Accordingly, we agree with Appellant and assume for the sake of argument that the terms "abuse," "humiliate," "harass," "degrade," and "arouse the sexual desire of any person" as used in Article 120b, UCMJ,[8] are discrete categories of specific intent and that the Government's proof must prove the specific category charged: here, an intent to "abuse."

However, we part ways with Appellant in applying the surplusage canon to this case. Whereas Appellant would have it that the surplusage canon mandates no overlap between statutory terms, we interpret the surplusage canon, in the light of *Sager* and *Mendoza*, as forbidding only the substantial submission of one statutory term to another. *See Mendoza*, 2024 CAAF LEXIS 590, at \*12 (explaining that the surplusage canon prohibits "an interpretation that causes [one statutory term] to *duplicate* another provision *or have no consequences*") (quoting *Sager*, 76 M.J. at 161) (emphasis added)).

---

[7] While the Government makes reference to *Black's Law Dictionary*, under the circumstances, we construe that "abuse" is essentially a lay term used within a legal statute, and thus susceptible to interpretation using lay dictionaries. *See Schmidt*, 82 M.J. at 75–76 (Ohlson, C.J., concurring in the judgment). We note that the *Black's Law Dictionary* definition largely aligns with the lay dictionary definition. *See* MERRIAM-WEBSTER, *Abuse*, https://www.merriam-webster.com/dictionary/abuse (last visited 14 Feb. 2025).

[8] We note that per Article 120b(h)(1), UCMJ, the definition of "sexual contact" for child sex offenses incorporates the definition of "sexual contact" from Article 120(g)(2), UCMJ.

The fact that there is conceivably some overlap between a definition of "*abuse*" that embraces both physical injury and emotional trauma, and other more specific and pointed instances of psychological harm within the meaning of "humiliate" and "degrade," does not render this entire statutory scheme surplusage. "Cruel treatment," including emotional trauma, does not completely subsume degradation or humiliation which we deem—by their plain and ordinary meanings—to be more particular parallel species of harm. "Humiliate," for example, ordinarily means "to lower position in one's own eyes or others' eyes."[9] "Degrade" means, *inter alia*, "to lower in grade, rank, or status," or "to strip rank or honors," or "to bring to low esteem or into disrepute."[10] Arguably, all of these terms have some overlap with each other, but we do not understand our superior court's precedent in *Sager* and *Mendoza* to stand for the proposition that any usage of similar terms by Congress will be invalidated by the surplusage canon. Instead, a definition is permissible so long as it still enables each statutory term to perform an "independent function." *Cf. Yates v. United States*, 574 U.S. 528, 543 (2015) (holding that the surplusage canon is violated when a purported statutory interpretation results in a "significant overlap" eliminating an independent function for each term). Thus, construing "abuse" within the statutory context of Article 120b(c), UCMJ, we find that Congress employed terms that stand for discrete varieties of both physical and psychological harm—*abuse*, *degrade*, and *humiliate*—creating a rational legislative structure that gives independent meaning to each term.

Applying these principles, we find our interpretation abides with the surplusage canon of construction by avoiding, *inter alia*, rendering the term "abuse" duplicative with the word "force," which are both contained within the same statutory scheme. *See* Article 120b(h)(2)(B), UCMJ, 10 U.S.C. § 920b(h)(2)(B) (defining "force" as "use of physical strength or violence as is sufficient to overcome, restrain, or injure a child"). It also avoids an absurd interpretation of the term "abuse" when applied to other types of conduct that fall under the definition of "lewd act" pursuant to Article 120b, UCMJ. Specifically, a definition of "abuse" purporting to only include physical abuse, would appear to be highly inapt to other areas where Congress assigned specific intent to "abuse" in situations not involving physical contact with the child victim, most notably, indecent exposure (of an accused to a child victim) and indecent language. *See* Article 120b(h)(5)(B), (C), UCMJ, 10 U.S.C. §§ 920b(h)(5)(B),(C). We find it highly improbable Congress prefaced the

---

[9] MERIAM-WEBSTER DICTIONARY, *Humiliate*, https://www.merriam-webster.com/dictionary/humiliate (last visited 14 Feb. 2025).

[10] MERIAM-WEBSTER DICTIONARY, *Degrade*, https://www.merriam-webster.com/dictionary/degrade (last visited 14 Feb. 2025).

criminality of the exposure of one's body parts or utterance of indecent language on an intent that the mere display or utterance would cause *physical* harm to a child victim. It strikes us that no matter how unsightly the indecent exposure nor how unsavory the indecent language, actual resulting physical harm therefrom would be a practical improbability and a near physical impossibility. By contrast, construing "abuse" as including an intent to inflict cruel treatment (including emotional trauma) aligns across the entirety of Article 120b—including those scenarios where the lewd act is performed without physical contact with the child victim.

Applying the common and ordinary meaning of abuse, we agree with the Government that the definition of "abuse" extends not only to physical injury but also more broadly to cruel treatment. As pointed out by the parties' briefs, dictionary definitions of "abuse" vary and involve, *inter alia*, references to physical maltreatment, infliction of a mental injury, and sexual abuse. Moreover, the term "abuse" must be considered in the context of the overall statutory scheme. *See Sager*, 76 M.J. at 161. Here we conclude that the term abuse is not limited solely to instances of physical abuse but rather to a broader category of "cruel" treatment that either causes or threatens to cause lasting harm to a child. *See Abuse*, BLACK'S LAW DICTIONARY 5. In this case, the cruelty stemmed from Appellant's willful subjection of his teenage daughter to his contact with and his exposure of her breasts, and to his contact with her vulva despite her specific pleas to stop. That cruelty and the high likelihood that the nature of the conduct caused or could cause lasting emotional harm is further enhanced by Appellant's admission to AB that she was too old for these "games," and by his persistence despite her verbal and physical resistance and the physical pain and discomfort that Appellant inflicted on her.

Having construed the applicable definition and qualifying conduct for "abuse," we move to Appellant's argument that he did not have the specific intent to "abuse" AB with his actions. We are unconvinced. First, even if we were to construe "abuse" as solely pertaining to physical harm, circumstantial evidence would establish such an intent as AB told Appellant not only that she was emotionally uncomfortable with "flash the world" and "I toe'd you so" but also physically uncomfortable. Regarding "I toe'd you so," AB specifically testified to the pain she felt in her vaginal area from Appellant forcefully pressing against her with his foot.

Second, Appellant's *post hoc* and self-serving insistence that "flash the world" and "I toe'd you so" were mere "games" does not render him immune from a finding that he harbored the requisite criminal intent to abuse. Those "games," under the circumstances, were not games in any meaningful sense of the word. Exposing his daughter's breasts against her will is no part of playful "wrestling," neither is intentionally placing his foot on her vaginal area and

engaging in a cringeworthy pun. Moreover, Appellant knew that AB was uncomfortable with "flash the world" and "I toe'd you so"—yet he persisted. Because Article 120b(c), UCMJ, is a specific intent offense, Appellant need only have honestly misinterpreted AB's reaction and feelings towards these "games" in order to lack the requisite intent to "abuse" (*i.e.*, inflict cruelty against) her. However, construing the facts at trial in the light most favorable to the Government and drawing all reasonable inferences therefrom, we conclude Appellant entertained no confusion as to whether these were mutually enjoyable "games" or cruel actions which he alone found amusing notwithstanding his daughter's feelings and protests. At a minimum, any misunderstanding vanished when AB, now post-pubescent and more assertive of her personal bodily autonomy, told Appellant to stop and physically resisted his contact with her intimate body areas. Under the totality of the circumstances, we are firmly convinced that Appellant made contact with AB's breasts and vulva as alleged and that he had the specific intent to abuse (*i.e.*, inflict cruel treatment upon) AB when subjecting her to his "flash the world" and "I toe'd you so" "games."[11]

---

[11] Finally, even if we were to accept Appellant's invitation to interpret "abuse" as only encompassing a specific intent to cause physical harm/pain, here we would still affirm Appellant's convictions for the "flash the world" and "I toe'd you so" encounters on that basis. Here, AB testified that the "I toe'd you so" game caused her pain, and while she did not testify in findings that she suffered physical pain as a result of the "flash the world" game, her suffering physical pain is not a required component of Appellant's intent to inflict it. Also, we can look at the underlying nature of the contact and indulge a reasonable inference that people generally intend the natural and probable consequences of their actions. *See United States v. Willis*, 46 M.J. 258, 262 (C.A.A.F. 1997) ("Under a concurrent-intent approach, we infer the intent when the result was the same as that intended or at least a natural and probable consequence of the intended result."); *United States v. Hoyt*, 48 M.J. 839, 842 (N.M. Ct. Crim. App. 1998) (quoting *United States v. Christensen*, 15 C.M.R. 22, 25 (C.M.A. 1954) (finding "as a rule of circumstantial evidence, a court-martial is certainly free to infer that a sane person intends the natural and probable consequences of his conduct")). So where, as here, Appellant is arm locking his daughter and roughly lifting her wire bra (while in the process touching her breast) to perpetrate the "flash the world" game, the natural and probable consequence would be the infliction of pain. Viewing this evidence from the light most favorable to the Government, we would find it legally sufficient to affirm Appellant's convictions even if the definition of "abuse" extends only to physical harm/injury. Likewise, as a matter of factual sufficiency, having ourselves reviewed the evidence thoroughly through fresh eyes, we are convinced that the evidence at trial also supports a finding, beyond a reasonable doubt, that Appellant inflicted the "flash the world" and "I toe'd you so" games upon his daughter with the intent to cause her physical harm/pain.

### b. Battery of AB: Grabbing AB's Neck

Appellant argues that no rational trier of fact could have found Appellant guilty of grabbing AB "by the neck with his hand" because AB did not directly testify that Appellant used his hands during his "chokeholds" and "headlocks" of her. We are unconvinced by Appellant's arguments.

Evaluating all the evidence admitted at trial, we hold a rational trier of fact could have found the elements of this specification proven beyond a reasonable doubt. The combined testimony of AB, corroborated by EB, who witnessed the event, established that on 27 August 2017, at the Santa Maria Inn, the incident occurred as alleged. The court members were permitted to draw reasonable inferences from AB's testimony at trial that Appellant "choked" her and "head locked" her, and determine that he used his hands in accomplishing his purpose. In assessing the legal sufficiency of this specification and drawing all reasonable inferences in favor of the Government, we conclude that the physical mechanics of placing another person in a chokehold or headlock involved hand contact by Appellant with AB's neck area.

Furthermore, even if Appellant did not place his hands on AB's neck as part of the "headlock" he put on her, the headlock was not the only part of the encounter that AB testified to. AB testified that Appellant "looked into her eyes" as he was *first* choking her—meaning he was facing her as he "choked" her. As described by AB at trial, this was the beginning of—not the end of—the encounter and it is not inconsistent with EB's past recollection recorded that he saw Appellant lifting AB with his arm around her neck. While Appellant would have us hold AB's use of the term "chokehold" to a specific term of art which includes holding another's neck from behind with the arm, there was no evidence presented that AB used that term specifically as an experienced mixed martial artist expert. Laymen routinely use terms that might not be in full accord with how an expert would use the term—which is why it is the context of the word usage that matters. Here AB's description of how Appellant initially assaulted her by "choking" her while facing her, progressing to a headlock where he was "swinging her around" with his arm around her throat represents a continuum of contact actions. The Government's charging language was a modest and understated version of what the facts at trial established, for not only did Appellant "grab" AB's neck, he demonstrably did so in the process of "choking" (*i.e.*, strangling) *and* head-locking her. Given that "choking" face-to-face (as AB described) is consistent with a "grabbing" type action of an assailant's hands to the neck of a victim, a rational trier of fact could reasonably conclude Appellant used his hand to "grab" AB's neck.

### c. Battery of AB: Striking AB's Face

Here Appellant argues that the Government failed to disprove the applicability of the parental discipline defense beyond a reasonable doubt, asserting: "[s]topping AB from continuing to scream and yell is a proper motivation for slapping his hand over her mouth, which stopped her from continuing to scream and yell." We disagree.

As a matter of legal sufficiency, reviewing all the evidence presented at trial and drawing all reasonable inferences in favor of the Government, we conclude a rational trier of fact could have concluded beyond a reasonable doubt that Appellant was predominantly motivated by personal anger, not parental control, when he assaulted AB on 27 August 2017. Such an interpretation is supported by Appellant's agitated state at the time, as confirmed by both of his children: AB, who was subjected to the physical violence, and EB, who witnessed it. Neither are we persuaded by TSgt JG's convenient amnesia on this issue, whereby she recalls with clarity all the moments of this altercation involving AB's loud yelling and pounding on their bedroom door yet has a sudden loss of clarity when it came to sounds of tumult during the physical altercation between Appellant and AB which immediately followed. Even if we were to assume that AB and TSgt JG each harbored biases motivating their testimony, there was another observer against whom neither side has cast aspersions. EB, the neutral eyewitness, corroborates the core of AB's version of events and contextualizes Appellant striking AB's face as an act of anger, not discipline.[12]

Furthermore, even assuming *arguendo* that Appellant could have been simply trying to exercise parental discipline over AB for getting in a verbal altercation with him and TSgt JG, the force Appellant used in an attempt to purportedly defuse that situation was both unreasonable and excessive. Here, Appellant slapping his hand across AB's mouth as she was purportedly screaming must be taken in context. First, she was screaming in part because of the other physical force Appellant was applying to her, namely placing his hand and forearm on her neck and lifting her up into the air, or, in the words of Appellant's son: "manhandling her." In short, AB's screams were, in part, defensive in nature. A parent attempting to silence his child so that no one will hear her cries for help while he abuses her does not strike us as a legitimate use of parental force. *Cf. United States v. Logan*, No. ACM 40407, 2024 CCA

---

[12] Indeed, we note that EB went so far as to testify during defense cross-examination that in his opinion AB's character for truthfulness was "not very truthful." Understanding this, we find the similarity between the events described in AB's testimony and corroborated by EB's past recollection recorded to be compelling because EB apparently had no interest in serving as a mere apologist for his sister.

LEXIS 307, *21–22 (A.F. Ct. Crim. App. 29 Jul. 2024) (unpub. op.) (holding that no justification defense applied to appellant's choking his wife to keep her from screaming suicidal ideations in the presence of the couple's children). While considered in the abstract, placing a hand over a screaming child's mouth could perhaps be viewed as a reasonable parental discipline measure to calm the child and mitigate "misconduct" resulting in a public disturbance, Appellant's actions here were in conjunction with a contemporaneous neck grabbing which functionally involved some level of strangulation. Furthermore, the evidence at trial was that the force applied by Appellant was excessive to any legitimate purpose where he "slapped his hand over [AB's] mouth" with enough force that it split her lip and caused her to bleed. Photographic evidence of her bloody lip recorded on the night of the event and presented at trial confirms this.

Accordingly, we find Appellant's conviction for this specification of assault consummated by battery—striking AB's face with his hand—legally sufficient. Moreover, having weighed the evidence in the record of trial, and having made allowances that we did not personally observe the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

## C. Ineffective Assistance of Counsel

Appellant alleges that his trial defense counsel were ineffective in their representation of him because they failed to ask additional questions of TSgt JG during her redirect examination at trial. Noting that TSgt JG was the sole defense witness in their case in chief who could testify to the events at the Santa Maria Inn on 27 August 2017, Appellant now claims that her redirect examination was deficient and case dispositive. We are unpersuaded. As explained below, under the circumstances, we decline to second-guess the tactical decision by trial defense counsel to forego additional redirect examination questioning. Trial defense counsel's assessment that further redirect examination was ill-advised was based upon a rational cost-benefits analysis evaluating the likelihood that additional questioning could rehabilitate the witness vice highlighting very disadvantageous aspects of TSgt JG's testimony.

### 1. Additional Background

The Defense called two witnesses in their case in chief at trial. The first was Appellant's wife, TSgt JG. The second was Dr. EB, who testified as an expert in forensic psychology and provided information on "oppositional personality disorder" and "false memory" during her testimony. Civilian trial defense counsel conducted the direct and redirect examinations of both witnesses. Appellant's claims of ineffective assistance of counsel are aimed solely at the redirect examination of TSgt JG.

For context, civilian trial defense counsel's direct examination of AB focused on demonstrating that AB had a bias against her father and a motive to fabricate her allegations against him. Accordingly, during direct examination of TSgt JG, civilian trial defense counsel elicited testimony that: (1) AB believed Appellant was a "bad man" who had had raped and beat AB's mother; (2) that AB was a "troubled" child who was "very belligerent" and "very argumentative" with Appellant and TSgt JG; (3) that part of the reason TSgt JG and Appellant sought a PCS to Vandenberg SFB in the summer of 2017 was to remove AB from "bad influences" which had resulted in her regularly skipping school, hanging out with other youths involved in drug abuse and shoplifting, and herself shoplifting; (4) that AB was unhappy about the move because her boyfriend (of whom Appellant and TSgt JG disapproved) remained in Colorado after AB moved to California.

TSgt JG also testified that AB had a history of making false allegations. She provided detail about a video in which AB claimed that TSgt JG and Appellant had beat AB up after they threatened that they would report her as a runaway to the police. TSgt JG affirmatively stated that neither she nor Appellant threatened AB nor laid a hand on her.

Turning to the facts of the 27 August 2017 incident, in contrast to AB's testimony, TSgt JG professed no recollection of the boxing gloves tape leading to the argument in the Santa Maria Inn. Contrary to both AB's testimony and EB's past recollection recorded, she also denied hearing or seeing anything about a "scuffle" in the living room, notwithstanding the fact that she had just testified to hearing AB "screaming at the top of her lungs" moments before she testified she saw AB exit TSgt JG's and Appellant's hotel bedroom and head for the hotel living room.

Trial counsel's cross-examination of TSgt JG sought to suggest that TSgt JG had a bias against AB and a motive to fabricate her testimony to assist her husband (Appellant). Appellant now asserts his trial defense counsel were ineffective at "rehabilitating" TSgt JG from those questions during redirect examination at trial:

- TSgt JG responded "no" when trial counsel questioned if it was her idea for Appellant to sign away parental rights for one of his children.

- TSgt JG responded that she "did not remember" in response to trial counsel asserting, "You actually have told people that if you had children, you might drown them in a bathtub?"

- TSgt JG admitted that she and Appellant went to the hotel restaurant to have dinner and a drink, a statement later

> used by the trial counsel to suggest that her lack of memory
> was due to the alcohol.

Meanwhile, in the midst of TSgt JG's cross-examination, the military judge provided a *sua sponte* instruction to the court members, advising them that the factual assertions made by counsel in questions are not themselves facts for the panel's consideration:

> Included in those instructions will be an explanation of a distinction that I'm confident you all already recognize that when an assertion inside of a question is posed to a witness and the witness' response back, you need to rely in your determination of the facts in the case on the evidence as presented by witnesses. *Put another way, a question is itself not evidence*.

(Emphasis added).

TSgt JG's redirect examination consisted of only four questions by trial defense counsel, focusing on why TSgt JG told civilian law enforcement, when they were responding to an alleged child abuse incident, that AB was a shoplifter, a runaway, and maintained two different Facebook pages to facilitate communications with her boyfriend. The manifest purpose of this brief redirect examination was to reframe trial counsel's insinuations that TSgt JG was intending to smear AB's character with the civilian law enforcement.

In support of his assignment of error, Appellant offers a sworn declaration by TSgt JG asserting that civilian trial defense counsel was aware of but failed to offer the following favorable information during TSgt JG's redirect examination: (1) there was no basis for the drowning comment, (2) she did not suggest Appellant give up custody of one of his children, and (3) AB was upset because she was not a flower girl at Appellant's and TSgt JG's wedding.

To provide additional facts for consideration in Appellant's assignment of error on this issue, this court ordered affidavits from Appellant's trial defense counsel. Both civilian and military trial defense counsel submitted responsive affidavits that align in their recall of pretrial interviews and trial events which ultimately informed civilian trial defense counsel's decision to keep his redirect examination limited. Justifying his decisions as to how he conducted TSgt JG's redirect examination, civilian trial defense counsel explained that he adopted "a less is more" approach during redirect, steering clear of highlighting trial counsel cross-examination questions because TSgt JG's answers during cross-examination either denied the premise of trial counsel's question (*i.e.*, she denied she was drunk and stated previously that she only had one drink at the Santa Maria Inn; she denied she urged Appellant to relinquish custody of his child) or professed a lack of recollection on a particular point (*i.e.*, did not recall ever making the "drown babies in the bathtub" comment). To sum up the

defense strategy vis-a-vis TSgt JG, military trial defense counsel's sworn declaration states:

> [W]e focused on a redirect that directed their attention back to the ultimate benefits of her direct: [AB]'s history of false allegations and anger at the time that formed [AB]'s motive to fabricate. Thus, our strategy for redirect generally was to get TSgt JG off the stand without reinforcing the issues raised on cross, instead refocusing the panel members on the history of false allegations.

**2. Law**

The Sixth Amendment[13] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Palik*, 84 M.J. 284, 288 (C.A.A.F. 2024) (citing *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> (1) Are the appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

> (2) If the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

> (3) If trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "An appellate court's evaluation of attorney performance is made from counsel's perspective at the time of the conduct in question." *United States v. Marshall*, 45 M.J. 268, 270 (C.A.A.F. 1996) (citing *Strickland*, 466 U.S. at 689). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls

---

[13] U.S. CONST. amend. VI.

within the wide range of reasonable professional assistance.'" *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). "Where . . . an appellant attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" *Id.* (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)). In assessing claims of ineffective assistance of counsel, we do not look at the success of the defense attorney's strategy "but rather whether counsel made an objectively reasonable choice in strategy from the alternatives available at the time." *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (citation omitted). In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted). Which is to say, "[i]t is not enough show that the errors had some conceivable effect on the outcome;" instead, "[c]ounsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (citations omitted).

### 3. Analysis

Here, Appellant premises his claim of ineffective assistance on five discrete areas, assigning fault to his civilian trial defense counsel for not addressing these matters during TSgt JG's redirect examination: (1) clarifying the amount of alcohol that TSgt JG drank at the Santa Maria Inn; (2) refuting the alleged comment about drowning children in a bathtub; (3) challenging whether TSgt JG suggested Appellant give up custody of one of his children; (4) highlighting that AB was allegedly upset that she was not a flower girl at Appellant's wedding to TSgt JG; and (5) AB's alleged motive to fabricate based upon Appellant declining to co-sign a car loan for her.

Applying the three-prong analysis set forth in *Gooch*, we find Appellant's trial defense counsel were not ineffective in making a tactical decision to ask particular follow-up questions and avoid others during TSgt JG's redirect examination at trial.

The defense team's expressed purpose for calling TSgt JG was to cast doubt on AB's credibility. In his brief, Appellant attempts to analogize his case to our

superior court's recent decision in *United States v. Palik*, which held trial defense counsel there were ineffective for failing to bring an R.C.M. 914 motion when there was "tremendous upside and virtually no downside" to such a tactic. 84 M.J. 284, 291 (C.A.A.F. 2024). This is an inapt comparison. Unlike *Palik*, here trial defense counsel undertook a rational cost-benefit analysis and declined to ask additional questions because of the danger of Government rebuttal with damning evidence and admissions from Appellant's video-recorded OSI interviews, heretofore not placed into evidence by the Government. When trial defense counsel weighed that risk against the futility of highlighting cross-examination questions where TSgt JG had no further substantive information to explain or retract her answers on cross-examination—he declined what he deemed to be a counter-productive endeavor. The fact that trial defense counsel's strategy might have proved unsuccessful is not dispositive to whether trial defense counsel was ineffective. *See Dewrell,* 55 M.J. at 136.

Here, TSgt JG had either denied or professed a lack of memory to what were arguably the most potentially damaging of trial counsel's cross-examination questions: *i.e.*, her allegedly urging Appellant to relinquish custody of his child and the "bathtub" comment. As a matter of law, there were no facts on the record supporting either of those assertions. Indeed, the military judge had given court members an instruction telling them as much during TSgt JG's testimony. Under the circumstances, while trial defense counsel could not "un-ring the bell" from trial counsel's cross-examination questions, they were certainly not deficient in declining to ring it *again*, particularly where the military judge had told the members that there was nothing to hear in the first place.

Similarly, based upon their pretrial investigations, trial defense counsel assessed that pursuing additional examination in furtherance of what they judged to be exceedingly weak potential motives to fabricate would have cast them as unreasonable. According to their affidavits, both civilian and military trial defense counsel judged that this line of questioning would damage the credibility of the Defense. In short, trial defense counsel believed that it would strain the imagination to float a theory that AB would fabricate allegations against her father for want of being a flower girl at a wedding ceremony she cared little about, or because of Appellant's refusal to co-sign a car loan for her in 2022 retroactively impacted her reports against him in August and November 2017. Instead, they made a strategic decision to limit their redirect so that the court members could focus on the target they intended them to focus on thanks to TSgt JG's testimony—AB's credibility or lack thereof. We decline to second guess a tactical decision informed by adequate pretrial preparation simply because it may not have proven successful.

Because we conclude Appellant has failed to demonstrate that his trial defense counsel's representation of him was "measurably below the performance

. . . [ordinarily expected] of fallible lawyers," *Gooch,* 69 M.J. at 362 (citation omitted), Appellant also failed to satisfy his burden for this assignment of error and we need not proceed to a prejudice analysis. Nonetheless, in an abundance of caution, even if we had concluded that Appellant's trial defense counsel's tactical decision as to the best methods of redirecting a problematic witness was ineffective, Appellant still suffered no prejudice. Here, the primary evidence convicting Appellant was not TSgt JG's credibility or lack thereof, but AB's credibility, which, while challenged repeatedly by Appellant at trial, was ultimately corroborated by Appellant's own statements in his pretext phone call with AB and in his social media messages with her. It is he who affirmed that the "flash the world" and "I toe'd you so" games both happened and that these "games" were wrong. It is he who conceded in his messages with AB that he had "anger issues." Moreover, the evidence supporting the battery specifications against Appellant was corroborated by EB's prior recollection recorded and by the physical evidence of a confrontation observed on AB's face and neck by the Santa Maria Inn patrons and responding civilian law enforcement officials. This is not a case where more questioning of TSgt JG—a witness with an obvious interest in the outcome of the case—on what amounts to tangential topics, creates the reasonable probability of a different verdict or sentence at trial.

## D. Excessive Post-Trial Delay

In review of Appellant's case, we note the record of trial was originally docketed with this court on 8 February 2023. Appellant requested, and was granted over the Government's opposition, 13 enlargements of time (amounting to 480 days or 16 months of total delay) to file his assignments of error brief, before filing his brief on 3 June 2024. The Government filed its answer after requesting and receiving, over defense opposition, one enlargement of time to secure responsive affidavits from trial defense counsel to answer Appellant's assignment of error raising ineffective assistance of counsel. The Government filed its answer brief on 5 August 2024. Appellant then filed his reply brief on 22 August 2024 after requesting and receiving a further enlargement of time of 7 days. This court issued its opinion in approximately 150 days after receiving Appellant's reply brief. In sum a total of 24 months elapsed between the docketing of Appellant's case and the issuance of this opinion. Appellant has not asserted his right to speedy appellate review.

### 1. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 132 (C.A.A.F. 2006) (citation omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the

case before the Court of Criminal Appeals." *Id.* at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted).

The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

### 2. Analysis

Over 18 months elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno*, there is a facially unreasonable delay. Although we note the 18-month threshold was exceeded by about six months, under similar circumstances where that delay was primarily occasioned by extended periods of defense-requested delay, we have held that such delays are not "excessively long." *See United States v. Washington*, No. ACM 39761, 2021 CCA LEXIS 379, at *109 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (holding that 23 months from case docketing to issuance of the court's opinion was "not excessively long").

Accordingly, we have considered the *Barker* factors and find no violation of Appellant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we do not find any at this stage. Regarding oppressive incarceration, we recognize Appellant entered confinement on 29 September 2022 and to date Appellant has not entered any request for speedy appellate review nor raised any particularized anxiety or concern as a consequence of the pendency of appellate proceedings before this court. Accordingly, we find no prejudice from any unreasonable delay. Absent prejudice, we find the delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. The record of Appellant's court-martial is substantial, including nearly 800 pages of written transcript, and the delay in adjudicating Appellant's appeal is primarily due to Appellant's own motions for enlargements of time. Moreover, both parties in this case requested and were granted motions to exceed page limits in their briefs, resulting in the

court reviewing Appellant's 73-page initial brief, the Government's 77-page answer brief, and Appellant's 39-page reply brief. The court accorded these voluminous filings the requisite time and attention they deserved under the circumstances. Accordingly, we find no violation of Appellant's due process rights. Furthermore, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), we conclude no such relief is warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[14]

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[14] We note that appellate review of Appellant's case is still ongoing and pending a potential reconsideration by this court, or Article 67, UCMJ, 10 U.S.C. § 867, review by our superior court. Accordingly, because the case remains inchoate, the military judge's conditional dismissal of Specification 1 of Charge II remains inchoate. *See* Article 71, UCMJ, 10 U.S.C. § 871.